IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 11, 2005 Session

## STATE OF TENNESSEE v. CHARLES HENRY JENKINS

**Direct Appeal from the Criminal Court for Sumner County**
**No. 940-2001     Jane W. Wheatcraft, Judge**

—————————

**No. M2004-01931-CCA-R3-CD - Filed August 1, 2005**

—————————

The defendant, Charles Henry Jenkins, was convicted by a Sumner County jury of one count of possession of more than .5 grams of cocaine with the intent to sell or deliver, a Class B felony, and one count of evading arrest, a Class A misdemeanor.  He was sentenced by the trial court as a Range I, standard offender to ten years for the cocaine conviction and eleven months, twenty-nine days for the evading arrest conviction, with the sentences ordered to run concurrently.  The defendant raises the following issues in this appeal: (1) whether the evidence was sufficient to sustain his cocaine conviction; (2) whether the trial court erred in excluding from his trial exculpatory tape-recorded statements made by the confidential informant involved in the case; and (3) whether the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), precluded the trial court from applying an enhancement factor to increase his cocaine sentence beyond the minimum in the range.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Joe Harsh, Gallatin, Tennessee (at trial), and Gregory D. Smith, Clarksville, Tennessee (on appeal), for the appellant, Charles Henry Jenkins.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Lawrence R. Whitley, District Attorney General; and Dee Gay, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The record in this case, viewed in the light most favorable to the State, reveals that on September 11, 2001, a man named Michael Powell approached Sumner County Drug Task Force

Investigator Greg Bunch at the drug task force office with information that he had just sold a pit bull to a local drug dealer known as "Charlie Boy." Explaining that he had fallen on hard times, Powell offered to arrange a cocaine purchase from the drug dealer, whom Investigator Bunch later identified as the defendant, in exchange for money. The drug task force investigators agreed and subsequently recorded a telephone conversation between Powell and the defendant in which Powell, using street lingo, told the defendant that he needed "three of them things," referring to three ounces of cocaine, and the defendant responded by telling him to come to his apartment.

The drug task force investigators searched Powell and his vehicle, wired him with a listening device, gave him $160 in recorded bills, and sent him to the defendant's Gallatin apartment with instructions to purchase an "eight ball" of cocaine. They then watched and listened as the defendant and Powell first met at the defendant's apartment and then left in separate vehicles. Deciding at that point to cancel the transaction, Investigator Bunch ordered one of his officers in a marked police car to pull Powell over, tell him the deal was off, and instruct him to return to the drug task force office. Investigator Bunch then returned to the office and began dismantling the listening equipment. Informed shortly thereafter that the drug deal was still on, Investigator Bunch drove to a location on Randolph Street where Powell, who no longer had the buy money, was waiting in his vehicle. The defendant drove up a few minutes later, saw and recognized Investigator Bunch, and took off at a high rate of speed. During the ensuing chase, he threw a plastic bag containing 5.3 grams of cocaine out the passenger side window of his vehicle, which was subsequently recovered by the drug task force investigators.

On April 16, 2004, the defendant filed a motion in limine seeking, in pertinent part:

That the State, its witnesses and/or agents be refrained from any mention, reference, argument or interrogation, either directly or indirectly, in any manner whatsoever, concerning any statement(s) made by the State's informant, Mike Powell. Further, the State should be prohibited from making any mention of or reference to the action and/or location of Mike Powell with reference to the defendant for any purpose.

In support of the motion, the defendant asserted that despite diligent efforts on the part of defense counsel and his agents to discover Powell's location, they had been unable to obtain personal service on him. The defendant argued that any statements by Powell would therefore be hearsay. He further argued that "ANY implication that Mike Powell's presence at any specific location or meeting with the defendant was related to some type of drug investigation or transaction would also be hearsay," and that defense counsel's inability to cross-examine Powell as to his statements or purported purpose in meeting with the defendant "would deprive the defendant of his right to due process."

The trial court granted in part and denied in part the defendant's motion in limine. Specifically, the court ruled that the tape-recorded conversations between the defendant and Powell were inadmissable and that the drug investigators would not be allowed to testify as to statements

Powell made to them, but they would be allowed to testify in general terms about having received information from a confidential informant and the steps they took in response to that information. Accordingly, at the April 20, 2004, trial, Investigator Bunch began his testimony by describing the undercover drug task force and the role confidential informants regularly play in its investigations. He then said that information he received from a confidential informant on September 11, 2001, led him to arrange for a controlled purchase of cocaine, using the confidential informant, from a "target of . . . investigation."

Investigator Bunch stated that the drug task force officers searched the confidential informant and his vehicle, wired him with a listening device, gave him $160 in prerecorded cash, and had him place a series of recorded telephone calls. Based on those telephone calls, the investigators went to the Greenwood Apartments in Gallatin, where they observed the informant make contact with a man Investigator Bunch had known for a number of years and immediately recognized as the defendant. After meeting at the defendant's apartment for approximately fifteen minutes, the confidential informant and the defendant left the apartment complex driving separate vehicles. Because it was apparent that the cocaine purchase was not going to take place at the apartment, as he had anticipated, Bunch ordered Investigator Ron Black, who was traveling in a marked unit, to stop the informant and instruct him that the drug deal was cancelled and that he should return to the drug task force office. Investigator Bunch then returned to the drug task force office with Investigator Kelly Murphy and began unloading the recording device from his vehicle.

Investigator Bunch testified that a call he received from Drug Task Force Investigator Lisa Byington one to two minutes later caused him and Investigator Murphy to drive to a location on Randolph Street, where they found the informant sitting in his vehicle outside a "known crack house." After speaking to the informant, patting him down and determining he no longer had the "buy money," Bunch returned to his vehicle to explain the situation to Investigator Murphy. He then saw the defendant approaching in his vehicle from the opposition direction. He and the defendant made direct eye contact, and the defendant "floored it," running two stop signs as he led the investigators on a high-speed chase that ultimately ended in the front yard of a residence on Greenleaf Circle.

Investigator Bunch testified he saw the defendant throw a bag of cocaine out of his vehicle during the chase. He further testified that he saw and made a mental note of the location where the cocaine landed. He described the scene:

> As we were traveling down Red River Road, we were following the car. We were getting close to him, probably no farther than from where we are to maybe where the Judge is at behind his vehicle, trying to get him to pull over. All of a sudden I saw the defendant, Mr. Charles Jenkins, throw a bag of cocaine out of the window, and I saw that cocaine laying [sic] -- when he threw it out, he threw it out the passenger-side window. I was on the passenger-side seat. I saw it come out, and I said, "He threw the dope." And I saw it laying [sic] on some gravel at a drive right there on Red River Road. I personally saw that.

3

According to Investigator Bunch, the area where the defendant tossed the cocaine was a residential neighborhood consisting of "fairly nice houses." He said he had never participated in any undercover drug buys in that neighborhood. He also stated that he and Investigator Byington returned to the location to recover the cocaine immediately following the defendant's arrest.

Investigator Bunch further testified that a gram of cocaine sells for approximately $100. He said that in his experience users typically purchase a "20 rock," which weighs approximately two-tenths of a gram and costs about $20. On cross-examination, he acknowledged he never heard the defendant use the words "drugs," "cocaine," or "crack," during his conversations with the confidential informant; that he knew nothing about the confidential informant prior to September 11, 2001, but later learned he had a criminal record; and that the confidential informant disobeyed a direct order by continuing forward with the drug deal. He further acknowledged that the investigators did not find any marked bills, large sums of cash, or drug paraphernalia on the defendant or in his vehicle. On redirect examination, he testified that drug dealers commonly use street lingo, rather than scientific names, to refer to the drugs they sell.

Cassandra Ann Franklin, a Tennessee Bureau of Investigation forensic chemist, testified she determined from her analysis that the evidence recovered in the case consisted of 5.3 grams of cocaine, a Schedule II controlled substance.

Sumner County Sheriff's Department Officer Lisa Byington testified she was assigned to the Drug Task Force in September 2001, and participated in the September 11, 2001, undercover drug operation involving the defendant. She described the initial meeting between the confidential informant and the defendant at the Greenwood Apartments, the men's departure from the apartment complex in separate vehicles, and Investigator Black's traffic stop of the confidential informant. She said that during the traffic stop, the defendant entered and then exited a convenience store and, as he came back out, watched to see what was happening with the informant's traffic stop. She testified that following the stop, the informant drove to the convenience store and spoke to the defendant for a few minutes. Next, the defendant returned to his vehicle and both men drove their separate vehicles to a location on Randolph Street, where they pulled up and the defendant once again got out of his vehicle to speak to the confidential informant. She testified that the defendant then returned to his vehicle and departed, leaving the confidential informant at the Randolph location. She said that at that point she called Investigators Murphy and Bunch to inform them that the drug deal was going forward.

Officer Byington testified the defendant returned in his vehicle to the location seven to ten minutes later, after Investigator Bunch had already arrived, patted the informant down, and gone back to his vehicle. She said that when she pulled up at the Greenleaf Circle location of the defendant's subsequent arrest, Investigator Bunch met her and requested that she accompany him to Red River Road to retrieve the cocaine the defendant had thrown from his vehicle during the chase. Officer Byington agreed the Red River Road location was not "the same type area" as the area where the informant had been waiting, in which drug sales frequently took place. She said the confidential informant did not get out of his vehicle from the time of the traffic stop until he was

4

patted down by Investigator Bunch on Randolph. On cross-examination, she testified she arrived at Greenleaf Circle only a few minutes after the defendant's arrest. She conceded, however, that other traffic had probably traveled Red River Road during the interim.

Hendersonville Police Officer Kelly Murphy testified he was assigned to the Sumner County Drug Task Force in 2001 and participated in the undercover drug operation that led to the defendant's September 11 arrest. He corroborated Investigator Bunch's account of the events leading up to the defendant's arrest on Greenleaf Circle, including the defendant's having thrown the cocaine out the passenger side window of his vehicle on Red River Road during the officers' pursuit. Specifically, he testified:

> Once we went through the stop sign at West Eastland and Red River, about the same time we noticed the driver of the car, which was later identified as [the defendant], throw something out the passenger side window. I thought there was [sic] two people in the car. Ended up being a pit bull that was in the front seat or back seat. I can't remember exactly where he was sitting. Looked like he was moving around. To me, it looked like another passenger in the car.

> After the object was thrown from the window, the vehicle made a left onto Walnut Crest and made another left onto Greenleaf Drive, and then the first right, which would be, I think, later identified as [the defendant's] sister's house. That is where [the defendant] was taken into custody at that time.

Investigator Murphy testified that he had not been involved in any undercover drug sales in the area of Red River Road where the cocaine was recovered.

Defense witnesses Sara Ann and Stacey Christian, who said they were mother and daughter, each testified that they were en route to the store in their vehicle on the evening of September 11, 2001, when police officers passed them in pursuit of the defendant, and that they did not see anything thrown out of the defendant's vehicle during the chase. Sara Ann Christian said, however, that her attention had been focused on the light the police officers had activated on their vehicle, which prevented her from seeing anything else, and Stacey Christian stated that it was dark at the time. Sara Ann Christian further testified that she had been a resident of the neighborhood for twenty years and regularly saw items she believed to be drugs or drug paraphernalia lying on the ground in the neighborhood. On cross-examination, she acknowledged she had a 1998 conviction for facilitation of the sale of a Schedule III drug and was no longer on probation.

The defendant testified that his September 11, 2001, conversations and meetings with the confidential informant had been solely to discuss the pit bull the informant had recently sold him and for him to show the informant a second pit bull he kept in the side yard of his grandmother's house. He denied that he ever attempted to sell drugs to the informant or that he threw any drugs out his car window.

5

## ANALYSIS

## I.  Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his cocaine conviction.  When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To convict the defendant of the cocaine possession offense, the State was required to show beyond a reasonable doubt that the defendant (1) knowingly possessed cocaine; (2) with the intent to sell or deliver; and (3) that the amount of cocaine the defendant possessed was .5 grams or more. Tenn. Code Ann. § 39-17-417(a)(4), (b)(1) (2003).  On appeal, the defendant challenges only the intent to sell or deliver element of the offense, arguing that absent the testimony of the confidential informant, the State failed to present sufficient proof of his intent to sell the drug.  The State asserts that the amount of cocaine in the defendant's possession, "combined with the scenario where [the defendant] was arriving at the location where the informant was waiting, following a meeting with the informant which had been set up for the purpose of effecting a drug sale," supported the jury's finding that the defendant possessed the cocaine with the intent to sell or deliver.  We agree with the State.

6

Viewed in the light most favorable to the State, the evidence presented at trial was more than sufficient to satisfy the intent to sell or deliver element of the offense. Tennessee Code Annotated section 39-17-419 provides that "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Evidence was presented that undercover drug task force officers arranged for a confidential informant to make a controlled cocaine purchase from the defendant, observed and monitored as the informant and the defendant met at three different locations in a relatively short span of time, and then watched as the defendant departed for an unknown location in his vehicle while the informant remained behind in his vehicle at a location known for drug activity. Evidence was further presented that the defendant returned to the location a short while later, made eye contact with an undercover drug officer with whom he was familiar, and immediately took off at a high rate of speed. During the ensuing chase, officers observed him throw 5.3 grams of cocaine out his vehicle's passenger side window.

Furthermore, although the officers did not find a large amount of cash in the defendant's possession, they also did not find any drug paraphernalia on his person or in his vehicle. This court has previously concluded that such lack of drug paraphernalia, combined with the amount of drugs found in a defendant's possession, may support an inference that the defendant possessed the drugs with the intent to sell or deliver rather than for his own personal use. See State v. William Martin Frey, Jr., No. M2003-01996-CCA-R3-CD, 2004 WL 2266799, at *8 (Tenn. Crim. App. Oct. 6, 2004), perm. to appeal denied (Tenn. Feb. 28, 2005) ("We have also found that possession of a large amount of drugs and the absence of any drug paraphernalia or apparatus indicative of personal use may also be sufficient to support a conviction for possession of a controlled substance with intent to sell or deliver.") (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999)). According to Investigator Bunch's testimony, the amount of cocaine the defendant threw from his vehicle far exceeded the amount purchased by the typical drug user. Under these circumstances, a rational jury could have inferred that the defendant possessed the cocaine with the intent to sell or deliver. We conclude, therefore, that the evidence presented in the case was sufficient to sustain the defendant's Class B felony cocaine possession conviction.

## II. Exclusion of Confidential Informant's Statements

The defendant next contends that the trial court committed reversible error by excluding allegedly exculpatory tape-recorded statements made by the confidential informant. The defendant sought to admit and made an offer of proof of two separate "statements" by Powell: (1) defense counsel's tape-recorded 2002 interview with him at the jail in which Powell told counsel he had been trying to trick the drug task force officers and that no drug transaction with the defendant had taken place; and (2) the tape-recorded telephone conversation between Powell and the defendant, which consisted primarily of a discussion about dogs with no direct mention made of cocaine, crack, or drugs. The trial court refused to allow either statement, ruling that they constituted hearsay which did not fall within any of the recognized exceptions.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn.), cert. denied, 534 U.S. 998, 122 S. Ct. 471, 151 L. Ed. 2d 386 (2001). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. Id.

The defendant first cites Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), to argue that his due process rights to present a full and complete defense required the admission of Powell's "confession," which, he asserts, was against Powell's penal interest. The State responds by arguing that Chambers is distinguishable on its facts and therefore inapplicable to the case at bar. We agree with the State.

The defendant in Chambers was charged with the murder of a police officer in Mississippi. 410 U.S. at 287. As part of his trial defense strategy, he attempted to show that the killing had instead been committed by a man named McDonald, who had given a sworn statement confessing the murder to Chambers' attorneys. Id. McDonald's sworn confession was admitted at trial, but McDonald himself testified that he was innocent of the crime and had repudiated the confession. Id. at 291. He also offered an alibi for the night in question. Id. Chambers then sought to introduce the testimony of three of McDonald's friends, each of whom had heard McDonald confess to the killing. However, he was prevented from doing so in each case by the operation of Mississippi's rule against hearsay. Id. at 292-93. In reversing the conviction, the Supreme Court concluded that the exclusion of the hearsay testimony, which was critical to Chambers' defense, coupled with the State's refusal to allow defense counsel to cross-examine McDonald regarding the repudiation of his confession, denied Chambers "a trial in accord with traditional and fundamental standards of due process." Id. at 302.

As the State points out, crucial to the Court's decision was that the hearsay statements Chambers sought to admit carried certain indicia of reliability that do not exist in the present case. The Chambers Court wrote:

> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case . . . . Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. . . . . Finally, if there was any question about the truthfulness

8

of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.

Id. at 300-01 (citations and footnote omitted).

In marked contrast to the situation in Chambers, in the case at bar Powell did not testify at trial and thus could not have been cross-examined by the State. Moreover, his "confession" that a drug sale had not taken place was by no means the same type of self-incriminatory statement as McDonald's confession that he had murdered a man. Furthermore, the statement occurred under entirely different circumstances than the confession in Chambers. Powell made the statement to a defense attorney several years after the event in question. Because he was also in jail at the time, he may well have believed that he somehow stood to gain by the disclosure, despite the fact that the defense attorney represented the man he had allegedly set up.

In addition, the defendant's ability to present a full defense was not seriously hampered by the exclusion of Powell's statements. The essential facts that led to the defendant's convictions, his meetings with the confidential informant, flight from police, and jettisoning of the bag of cocaine, were all witnessed by and recounted at trial by the drug task force investigators involved in the case. We conclude, therefore, that the defendant's due process rights to present a full defense were not violated by the exclusion of Powell's hearsay statements.

Asserting that "[p]aid [c]onfidential [i]nformants are agents of the government," the defendant also argues that the tape recordings were admissible under the admission of a party-opponent exception to the rule against hearsay. We respectfully disagree.

Tennessee Rule of Evidence 803(1.2) provides in pertinent part that an admission by a party-opponent consists of a statement offered against a party that is:

(A) the party's own statement in either an individual or a representative capacity, or (B) a statement in which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D), a statement by an agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship under circumstances qualifying the statement as against the declarant's interest regardless of declarant's availability[.]

Tenn. R. Evid. 803(1.2)(A)-(D). The statement in this case meets none of the criteria above. It was not the State's statement, the State did not manifest a belief in its truth, Powell was not authorized by the State to make it, and it was not made during the existence of Powell's brief-lived "relationship" with the drug task force. We, therefore, conclude that the trial court did not abuse its discretion in excluding the tape recordings as inadmissible hearsay.

9

## III. Sentencing

As his final issue, the defendant challenges the trial court's application of enhancement factor (9) to his cocaine possession conviction. The trial court applied the following two enhancement factors to increase the defendant's cocaine possession sentence beyond the presumptive eight-year minimum for a Range I offender convicted of a Class B felony: (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and (9), the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. Tenn. Code Ann. § 40-35-114(2), (9) (2003).

On appeal, the defendant contends that Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), in which the United States Supreme Court held that, other than a prior conviction, any factors used to increase a defendant's sentence must be found by the jury or admitted by the defendant, precluded the trial court from applying enhancement factor (9) to his cocaine conviction. Our supreme court, however, has recently determined that Blakely does not affect Tennessee's sentencing procedures. See State v. Gomez, 163 S.W.3d 632 (Tenn. 2005). Accordingly, the defendant's argument on this issue is without merit.

The defendant's presentence report, relied on by the trial court, reflected that the defendant had numerous prior convictions as well as a violation from a 1996 community corrections sentence. Moreover, as the State points out in its brief, the defendant himself acknowledged at the sentencing hearing that he had repeatedly violated the terms of his community corrections sentence. The following colloquy took place between the prosecutor and the defendant:

Q.      And while you were on community corrections, you picked up these, at least two misdemeanor convictions. Is that correct?

A.      Correct.

Q.      And do you remember being arrested three times while you were on community corrections for a different community corrections violation matter?

A.      Correct.

Q.      Three different times.

I've got a warrant here from 1997, March 3rd, 1997. The problem was you tested positive for cocaine; in violation of house arrest; and you failed to report to the field office. So after all those chances, you blew it, didn't you?

A.      Well, I was using drugs.

Q. Is that your excuse?

A. No, it is not an excuse. It is just the truth.

We conclude, therefore, that the record fully supports the trial court's application of enhancement factor (9) to the defendant's cocaine possession sentence.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

_____
ALAN E. GLENN, JUDGE

11